**UNITED STATES of America,**
**Appellee,**

v.

**Perry REICH, Defendant–Appellant.**

**Docket No. 06–1445–cr.**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 26, 2007.

Decided: March 2, 2007.

Amy Busa, Assistant United States Attorney (Roslynn R. Mauskopf, United States Attorney, Eastern District of New York, David C. James, Assistant United States Attorney, on the brief), Brooklyn, NY, for appellee.

Mark M. Baker (Benjamin Brafman, Karen A. Newirth, on the brief), Brafman & Associates, P.C., New York, NY, for defendant-appellant.

Before KEARSE and SOTOMAYOR, Circuit Judges, and KOELTL, District Judge.*

SOTOMAYOR, Circuit Judge.

Defendant-appellant Perry Reich appeals from the March 31, 2006 and the May 1, 2006 amended judgment of the United States District Court for the Eastern District of New York (Garaufis, J.), convicting him, following a jury trial, of one count of corruptly obstructing a judicial proceeding, in violation of 18 U.S.C. § 1512(c)(2), one count of forging a judge's signature, in violation of 18 U.S.C. § 505, and one count of making a false statement to a federal officer, in violation of 18 U.S.C. § 1001(a)(2), in connection with his fabrication of a court order. Reich challenges his conviction on all three counts, his sentence to twenty-seven months imprisonment, and the district court's March 10, 2006 denial of his motions for a judgment of acquittal, for a new trial, and for bail pending appeal, *United States v. Reich,* 420 F.Supp.2d 75 (E.D.N.Y.2006). Reich raises five issues on appeal: (1) that there was insufficient evidence to establish that his conduct would have the "natural and probable effect" of obstructing the lawsuit, such that a conviction for obstruction of justice under 18 U.S.C. § 1512(c)(2) was inappropriate; (2) that the jury should have been instructed to find, and evidence was required to establish, an intent to defraud under 18 U.S.C. § 505; (3) that it was error to permit the government to cross-examine Reich's character witness by asking about an allegedly "private" unauthorized change to his law partner's life insurance policy; (4) that there was insufficient evidence to establish that he made a false statement to a government agent; and (5) that the district court improperly applied a "special skills enhancement" in calculating Reich's sentence under the United States Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines"). We disagree with all of Reich's arguments on appeal and affirm his conviction on all counts.

## BACKGROUND

The following account is drawn from the evidence adduced at trial before Judge Nicholas G. Garaufis.

### The Ryan Beck Lawsuit

Sometime before the activity that gave rise to Reich's criminal conviction, Reich, who is a lawyer, commenced through counsel an arbitration proceeding against a brokerage firm he alleged had mishandled his account. This firm was subsequently

---

* The Honorable John G. Koeltl, United States District Judge for the Southern District of New York, sitting by designation.

acquired by Ryan Beck & Co. ("Ryan Beck"), another brokerage firm, and Reich amended his arbitration claim to include Ryan Beck as a respondent. In July 2002, Ryan Beck filed a lawsuit in the Eastern District of New York, seeking to enjoin Reich and several other defendants, also former investors who had filed arbitration claims (collectively, the "investor-defendants"), from arbitrating against it. *Ryan Beck & Co. v. Fakih,* No. 02 Civ. 4052 (E.D.N.Y.) (*"Ryan Beck v. Fakih"* or the "Ryan Beck lawsuit").[2] The case was assigned to Chief Judge Edward R. Korman, who referred the preliminary injunction motion to Magistrate Judge Roanne L. Mann; eventually, the parties agreed to have Magistrate Judge Mann preside over the entire case. *See* Order, *Ryan Beck v. Fakih,* No. 02 Civ. 4052 (E.D.N.Y. Nov. 7, 2002) (Docket Entry No. 49).[3]

In September 2002, Magistrate Judge Mann issued an order denying Ryan Beck's motion for a preliminary injunction staying arbitration, and on June 4, 2003, she issued another order denying Ryan Beck's motion for reconsideration of that decision. *See* Order, *Ryan Beck v. Fakih,* No. 02 Civ. 4052 (E.D.N.Y. Sept. 23, 2002) (Docket Entry No. 28); Order, *Ryan Beck v. Fakih,* No. 02 Civ. 4052 (E.D.N.Y. June 4, 2003) (Docket Entry No. 83) (the "June 3 Order").[4] Because the June 3 Order did not resolve Ryan Beck's outstanding summary judgment motion, however, Ryan Beck's attorney, Joel Davidson ("Davidson"), of the law firm Davidson & Grannum, filed an application for a writ of mandamus in the United States Court of Appeals for the Second Circuit to compel Magistrate Judge Mann to issue a ruling.

*The Forged Order*

On June 17, 2003, at approximately 11:10 a.m., Davidson & Grannum's law office received a four-page fax transmission that purported to be, but was not, an order issued by Magistrate Judge Mann ("the forged Order"), which was dated June 17, 2003, and bore Magistrate Judge Mann's fax header and signature. The forged Order directed that "[t]he orders denying the preliminary injunction are recalled and vacated, and defendant Fakih and its counsel are enjoined from proceeding with the arbitration hearing against Ryan Beck and the brokers." It also recused Magistrate Judge Mann from further proceedings in the case, stating that she had discussed the suit with Chief Judge Korman, "who recommended to me that I recuse myself from the case and return the matter to him. . . . Given the manner in which I have handled this case, a reasonable person would believe that I was not impartial, and recusal logically follows." Finally, the order returned the matter to Chief Judge Korman and stated:

> The parties shall notify Chief Judge Korman by letter whether they consent to further proceedings before a different Magistrate Judge, whether the matter can be decided on the basis of the current submissions without the necessity for additional argument, and whether . . . sanctions may be imposed against and [sic] of the defendants.

The forged Order bore similarities to the June 3 Order: It had the same cap-

---

**2.** Though a lawyer, Reich was represented by counsel in the proceedings. Civil Docket, *Beck & Co. v. Fakih,* No. 02 Civ. 4052 (E.D.N.Y.).

**3.** The Order was signed September 11, 2002, but was not docketed until November 7, 2002.

**4.** Though this Order was docketed June 4, Magistrate Judge Mann signed it on June 3. Because the district court and the parties have referred to it as the "June 3 Order," we now do so for consistency.

tion, final page, and fax header, and was faxed at the same time of day. The date of the forged Order appeared to have been changed by hand, and one part of the text alignment was skewed. The forged Order also contained information that only someone familiar with the Ryan Beck lawsuit would know; for example, it included details of the June 3 Order and contained a phrase—"mixing apples and oranges"— that Davidson occasionally used during the litigation. Telephone records produced at trial indicated that at 11:08 a.m. on June 17, a call lasting several minutes was initiated to Davidson's fax machine from Reich's home using a pre-paid calling card.

Davidson's secretary found the forged Order in the fax tray shortly after 11 a.m., and handed it to another lawyer at Davidson's firm; that attorney faxed the forged Order to Davidson, who was at home. In response to the forged Order, Davidson wrote a letter to the Second Circuit withdrawing his application for a writ of mandamus, which he understood the forged Order to render moot. Because the forged Order purported to enjoin only one of the investor-defendants from arbitrating, however, Davidson also contacted Chief Judge Korman to inquire how he should proceed regarding the remaining investor-defendants. In addition, Davidson circulated the forged Order to various arbitration panels and attorneys representing Ryan Beck in other jurisdictions.

Magistrate Judge Mann learned of the forged Order sometime in the afternoon of June 17 or June 18, when the attorney for one of the investor-defendants called her chambers to say he had heard that she had issued a decision. On June 18, she signed an order stating that the forged Order was fraudulent, had not been issued by the court, and should not be relied on in any manner. *See* Order, *Ryan Beck v. Fakih*, No. 02 Civ. 4052 (E.D.N.Y. June 23, 2003)

(Docket Entry No. 110). She also contacted the Second Circuit so that it would not rely on the forged Order for purposes of considering the mandamus application, and notified the United States Attorney's Office for the Eastern District of New York of the forged Order. The United States Attorney's Office referred the matter to the Federal Bureau of Investigation ("FBI") for investigation.

*Reich's Pretrial and Trial Statements*

After the FBI's initial investigative efforts yielded phone records linking Reich's phone number to the fax transmission of the forged Order, FBI agents interviewed Reich at the end of July 2003. Reich denied having any contact with Davidson on June 17, and denied using prepaid telephone cards. The agents again spoke to Reich in August, when they searched his home pursuant to a warrant. Reich stated that he may have contacted Davidson regarding a confidentiality agreement. When an agent asked Reich why telephone records would reflect a several-minute connection between his phone and the Davidson fax machine, Reich stated that he may have dialed the fax line inadvertently and hung up. To explain why such an inadvertent call would last over three minutes, he stated that his phone did not always disconnect the line immediately upon hanging up.

The following March, Reich and his attorney met with the FBI agents for a proffer session. When asked whether he had called Davidson, Reich reiterated that he had dialed the Davidson fax by mistake, and again denied owning or using calling cards, although he said he had purchased one for his girlfriend. The agents offered Reich the opportunity to state that he had sent the forged Order as a "joke." According to Reich's testimony at trial, he responded: "No, I told them distinctly no matter what, no matter [what] the conse-

quences ... were to me I said I would never, never say that. I didn't do it. As I sit here today, I will never say that I did something I didn't do."

At trial, Reich continued to deny creating the forged Order. He stated that he had tried to call Davidson's phone line to discuss a discovery issue and engage in settlement discussions, but dialed Davidson's fax number by mistake and subsequently hung up. He admitted using a calling card to make the call, but said he had done so because he was having trouble with his phone service.

Asked about his fax capabilities, Reich admitted he owned a fax modem the government had seized during its search. He was also questioned about whether he owned a Canon Fax Phone 8, the manual to which had been found in his home. He admitted he had once owned such a machine but claimed that he had discarded it several years earlier.

*Fax Testimony at Trial*

The government called a fax expert at trial, who testified that the evidence was consistent with the forged Order having been faxed from Reich's home. For example, the length of the call was consistent with the transmission of a four-page document, and the fax log records could not have been generated from an inadvertent phone call because Davidson's fax machine, which would have received the phone call, was designed to terminate such calls after forty-one seconds. The expert also stated that because of the page numbering on the forged Order, he could tell that the last three pages of the fax had been transmitted as a single long sheet. Reich's fax expert countered that Reich's fax modem could not have transmitted the final three pages as a single sheet, and so could not have been used to transmit the forged Order found in Davidson's fax tray. He admitted, however, that he had not tested

a Canon Fax Phone 8. The government's rebuttal witness testified that a Canon Fax Phone 8 could have transmitted the forged Order.

*Character Testimony at Trial*

Reich called James Pelzer, Clerk of the Court, New York State Supreme Court, Appellate Division, Second Department, as a character witness. Pelzer testified that he and others believed Reich to be a person of honesty and integrity. On cross-examination, the government sought to ask Pelzer about an incident in which Reich, immediately after learning that his law partner Steven Schapiro had terminal cancer, allegedly changed the beneficiary of Schapiro's life insurance plan from Schapiro's family to the partnership without first notifying him as the partnership agreement required. Following an objection by defense counsel and a discussion outside the jury's presence, Judge Garaufis permitted the government to ask the following question: "[I]f I told you that Mr. Reich had changed the beneficiary of an insurance policy away from Mr. Schapiro's family members, designating the law firm the beneficiary in the event of Mr. Schapiro's death, without notice to Mr. Schapiro and in violation of the partnership agreement that the two of them had, would that change your opinion or the opinion of the community ... with regard to the defendant's honesty or good character?" Trial Tr. 847. Pelzer responded that it might.

When Reich testified in his own defense, he explained that he had notified Schapiro before changing the policy beneficiary, and that he had done it in order to protect the firm with regard to money loaned by Schapiro's mother to Schapiro, for which the firm was responsible.

*Conviction, Sentencing, and Post–Trial Motions*

After deliberations on August 25, 2005, the jury returned a verdict of guilty on all

three counts. Reich moved for a judgment of acquittal and for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33, alleging insufficient evidence to support convictions on any of the three counts, improper impeachment of a character witness, and improper rebuttal.[5] *See Reich,* 420 F.Supp.2d at 81. He also moved for bail pending appeal. Judge Garaufis denied the motions for a judgment of acquittal and for a new trial, holding principally that there was sufficient evidence that Reich sent the forged Order, that he obstructed an official proceeding within the meaning of § 1512(c)(2), and that he made a false statement to the FBI. *Reich,* 420 F.Supp.2d at 82–85. Judge Garaufis also denied Reich's motion for bail pending appeal, finding that his rulings did not raise any substantial questions for appeal. *Id.* at 90–91.

The presentence report prepared by the United States Probation Department calculated Reich's combined adjusted offense level as 18. This included a "special skills enhancement," *see* U.S.S.G. § 3B1.3, on all three counts, based on the Probation Department's conclusion that Reich's special skills as an attorney facilitated his crimes. At sentencing, Judge Garaufis found the enhancement warranted and applied it to all three counts. He found the Guidelines range of 27 months to 33 months to be reasonable and sentenced Reich to 27 months' imprisonment. This appeal followed.

## DISCUSSION

We address each of Reich's challenges to his conviction in turn.

**5.** He subsequently amended those motions, but did not change in any way their significant underlying bases.

**6.** Section 1503, titled "Influencing or injuring officer or juror generally," subjects to criminal liability one who corruptly "endeavors to

## I. Obstruction of Justice

■ Reich challenges as insufficient the evidence supporting his conviction for obstruction of justice under 18 U.S.C. § 1512(c)(2), which subjects to criminal liability one who "corruptly ... obstructs, influences, or impedes any official proceeding, or attempts to do so." In *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), the Supreme Court construed the intent element of 18 U.S.C. § 1503, whose relevant language is substantially similar to the relevant language in 18 U.S.C. § 1512(c)(2),[6] to include a "nexus requirement." *Id.* at 600, 115 S.Ct. 2357 (internal quotation marks omitted); *see also United States v. Schwarz,* 283 F.3d 76, 108 (2d Cir.2002). To satisfy this requirement, the defendant's conduct must "have a relationship in time, causation, or logic with the judicial proceedings"; in other words, "the endeavor must have the natural and probable effect of interfering with the due administration of justice." *Aguilar,* 515 U.S. at 599, 115 S.Ct. 2357 (internal quotation marks omitted). Reich concedes that the necessary nexus can exist when the discretionary actions of a third person are required to obstruct the judicial proceeding, but he alleges that the evidence adduced at trial failed to establish such a nexus because it was not foreseeable to Reich that the third party, Davidson, would act on the forged Order in such a way as to obstruct the judicial proceeding.

■ This Circuit has not previously applied *Aguilar's* nexus requirement to § 1512(c)(2). We have, however, applied it

influence, intimidate, or impede" an officer or juror or "influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a).

not only to § 1503, *see Schwarz,* 283 F.3d at 108–09, but also to 18 U.S.C. § 1505, which subjects to criminal liability one who "corruptly ... influences, obstructs, or impedes ... the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States," *see United States v. Quattrone,* 441 F.3d 153, 174 (2d Cir.2006). The language of § 1505 is even more similar to § 1512(c)(2) than is § 1503, and given that the parties have not disputed *Aguilar's* application to § 1512(c)(2), there is no reason not to apply it. *See Quattrone,* 441 F.3d at 170 n. 18 (stating that the parties had treated §§ 1503 and 1505 "the same for analytical purposes" and that the court saw "no reason for taking a different tack" because "[t]he only relevant distinction between the two statutes—at least in the context of this case—lies in the attendant circumstances of the obstruction"). Accordingly, we hold that § 1512(c)(2) incorporates a "nexus requirement" as articulated in *Aguilar.*

Reich has failed to show that the evidence was insufficient to establish a nexus between his actions and obstruction of the proceeding. *See United States v. Matthews,* 20 F.3d 538, 548 (2d Cir.1994) (describing the "heavy burden" on defendants who challenge the sufficiency of evidence). Because the forged Order appeared to render moot Ryan Beck's application to the Second Circuit for a writ of mandamus, it was foreseeable that upon receiving the forged Order, Davidson would withdraw the application, as he in fact did. In addition, because the forged Order expressly invited the parties to contact Chief Judge Korman regarding further proceedings, it was foreseeable that Davidson would contact Chief Judge Korman, as he in fact did. This evidence is clearly sufficient to establish a "relationship in time, causation, or logic" between Reich's transmission of the

forged Order and effects on the judicial proceeding, as *Aguilar* requires. 515 U.S. at 599, 115 S.Ct. 2357. Moreover, that relationship is much closer than those found insufficient in *Aguilar* or *Schwarz,* where the defendants merely made false statements to agents who might or might not later testify before a grand jury. *See Aguilar,* 515 U.S. at 600, 115 S.Ct. 2357; *Schwarz,* 283 F.3d at 109. It is also closer in time, causation, and logic than the relationship found sufficient in *Quattrone,* where the defendant sent an email to his staff endorsing a suggestion to destroy documents that might eventually be subpoenaed by a grand jury. 441 F.3d at 166, 172. Here, by contrast, Reich directly injected a false order into ongoing litigation to which he was a party. The forged Order purported to enjoin a party from acting in an arbitration, directed the parties to contact Chief Judge Korman, and mooted a party's application before the Second Circuit, thereby inducing that party to withdraw it. The effects of the forged Order were more "natural and probable" than those in *Aguilar, Schwarz,* or *Quattrone.*

Reich also claims that no "obstruction" occurred within the meaning of § 1512(c)(2) because there was no evidence that "the fairness or outcome of the Ryan Beck lawsuit was affected in any way." He observes that unlike the language of § 1503, which contemplates action affecting the "due administration of justice," § 1512(c)(2) contemplates only actions affecting "any official proceeding." This difference, Reich contends, indicates Congress's intent not to criminalize under § 1512(c)(2) actions that impact the administration of justice but that do not "actually" affect the outcome of the official proceedings. This interpretation, however, is inconsistent with the plain language of the statute, which encompasses all actions that

"corruptly ... influence[ ]" a proceeding—or even attempt to do so—not merely those that affect its ultimate outcome. Moreover, the injection of the forged Order into the Ryan Beck lawsuit at the very least "influence[d]" the proceedings, in that it caused a litigant to withdraw a filing and contact a judge, and caused Magistrate Judge Mann to issue an order explaining the falsity of the forged Order and to convene a status conference to discuss it.

## II. Forgery of a Judge's Signature

■ Reich claims the district court erred in failing to instruct the jury that the forgery count under 18 U.S.C. § 505 requires proof of intent to defraud. Acknowledging that § 505, which makes it a crime to "forge[ ] the signature of any judge ... of any court of the United States ... or forge[ ] or counterfeit[ ] the seal of any such court, or knowingly concur[ ] in using any such forged or counterfeit signature or seal, for the purpose of authenticating any proceeding or document," does not on its face require an "intent to defraud," Reich nonetheless argues that we should find such a requirement because it is an element of common-law forgery, and the common law should inform our interpretation of federal criminal statutes.

Whether § 505 requires an intent to defraud is an issue of first impression for this Court, but two other circuits have addressed it. In 1931, the Sixth Circuit endorsed the view Reich now advances, holding that Congress intended § 505 to include the common-law element of intent to defraud. *Levinson v. United States*, 47 F.2d 470, 471 (6th Cir.1931);[7] *see also United States v. Bertrand*, 596 F.2d 150, 152 (6th Cir.1979) (referring to *Levinson* and finding that the appeal was governed by *stare decisis*). The Tenth Circuit, however, drew the opposite conclusion.[8] *United States v. Cowan*, 116 F.3d 1360, 1361 (10th Cir.1997). We now join the Tenth Circuit in holding that § 505 does not require an intent to defraud.

In interpreting a statute, "[w]e start, as always, with the language of the statute." *Williams v. Taylor*, 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). The text of § 505 contains no intent-to-defraud element; "[t]o the contrary, § 505's plain language only requires that a defendant ... knowingly forge the signature of a federal judge 'for the purpose of authenticating any proceeding or document.'" *Cowan*, 116 F.3d at 1362 (quoting 18 U.S.C. § 505).

It is true that courts frequently construe an undefined statutory term in a federal criminal statute to carry its common-law meaning, *see United States v. Turley*, 352 U.S. 407, 411, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), and that the common-law crime of

7. The version of 18 U.S.C. § 505 analyzed in *Levinson* was part of a predecessor statute to the current § 505, which was enacted in 1948, *see* Pub.L. No. 80–772, 62 Stat. 683 (1948), but the relevant language is identical.

8. Reich claims that two additional Circuits have joined the Sixth in holding that § 505 requires an intent to defraud, but neither of the cases he cites actually reached that question. *See United States v. London*, 714 F.2d 1558, 1563–64 (11th Cir.1983) (looking to the scope of common law forgery for the unrelated purpose of shedding light on whether passing off a photocopy of a judge's signature as an original fell within the ambit of § 505, but not addressing the question of intent to defraud, which was not before the court); *United States v. Dyer*, 546 F.2d 1313, 1316 (7th Cir.1976) (expressly declining to reach the question of whether § 505 required an intent to defraud because the court below erred in failing to find an unrelated "essential element," though suggesting in dictum that "much could be said for" the view that § 505 did require an intent to defraud).

forgery required an intent to defraud, *see generally Moskal v. United States*, 498 U.S. 103, 121–28, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (Scalia, J., dissenting). But it is also well-established that courts should not assign a common-law meaning to a statutory term "when that meaning is . . . inconsistent with the statute's purpose." *Taylor v. United States*, 495 U.S. 575, 594–95, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990); *see also Moskal*, 498 U.S. at 117, 111 S.Ct. 461 ("Congress' general purpose in enacting a law may prevail over th[e] rule of statutory construction" that terms be given their common-law meanings.). Here, we agree with the Tenth Circuit that to import the common-law element of intent to defraud into § 505 would thwart Congress's goal in enacting the provision. *See Cowan*, 116 F.3d at 1363.

Historically, the term "to defraud" has "refer[red] to 'wronging one in his property rights by dishonest methods or schemes,' and 'usually signif[ied] the deprivation of something of value by trick, deceit, chicane or overreaching.' " *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)). By contrast, § 505 is concerned not with protecting private parties from financial loss, but with protecting the integrity of a government function—namely, federal judicial proceedings. "In considering a statute enacted for the protection of the government," we need not interpret a term "from the same standpoint from which the question would be considered if the word . . . were used in a state statute enacted for the protection of ordinary property rights of individuals . . . [because] in the one instance the statute in its ordinary accep-

tation has reference to property and property rights alone, while in the other it has reference to a broader purpose, that of protecting the government in its administration under the law. . . ." *Curley v. United States*, 130 F. 1, 8 (1st Cir.1904) (finding that a statute penalizing conspiracies to "defraud" the United States encompassed conspiracies not aimed at property interests); *see also McNally*, 483 U.S. at 359 & n. 8, 107 S.Ct. 2875 (citing *Curley* with approval). When an individual forges a judge's signature in order to pass off a false document as an authentic one issued by the courts of the United States, such conduct implicates the interests protected by § 505 whether or not the actor intends to deprive another of money or property. To construe § 505 to proscribe such conduct is "true to both its text and purpose." *Cowan*, 116 F.3d at 1363.[9]

A survey of the counterfeiting and forgery provisions of Title 18, Chapter 25, in which § 505 appears, supports this interpretation. The current § 505 was enacted in 1948 along with the bulk of the other provisions appearing in Chapter 25. *See* Pub.L. No. 80–772, 62 Stat. 683 (1948) (the "1948 Act"). Of those provisions, some very clearly require an intent to defraud, *see, e.g.*, 18 U.S.C. § 471 (prohibiting forgery of federal obligations and securities with "intent to defraud"); 18 U.S.C. § 478 (prohibiting forgery of foreign obligations and securities "with intent to defraud"); 18 U.S.C. § 482 (prohibiting forgery of foreign bank notes "with intent to defraud"), while others do not contain such a requirement, *see, e.g.*, 18 U.S.C. § 493 (prohibiting forgery of writings issued by certain federal lending agencies); 18 U.S.C. § 496 (prohibiting forgery of documents pertaining to imports and customs duties), and still oth-

---

**9.** We note, as did the Tenth Circuit, that there is "[n]o elucidating legislative history" of § 505, making us even more "hesitant to

stray from the plain language of the statute." *Cowan*, 116 F.3d at 1363.

ers enumerate several crimes, only one or some of which require an intent to defraud, *see, e.g.,* 18 U.S.C. § 506 (prohibiting, without mention of intent to defraud, the "false[ ] mak[ing], forge[ry], counterfeit[ing], mutilat[ion], or alter[ation]" of the seal of any U.S. department or agency, but prohibiting the possession, sale, or other transfer of such fraudulent seal only with "fraudulent intent").[10] This variation strongly suggests that Congress deliberately chose to require an intent to defraud for some forgery and counterfeiting crimes, but not for others. *Cf. Whitfield v. United States,* 543 U.S. 209, 216, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) (stating that Congress's inclusion of an express overt-act requirement in many conspiracy statutes, but not the one considered by the Court, "clearly demonstrat[ed] that it knows how to impose such a requirement when it wishes to do so").

We also note that of the provisions originally enacted in the 1948 Act, those requiring an intent to defraud were generally oriented toward a different purpose than those not requiring such an element. Provisions in the first category frequently criminalized forgeries and counterfeits likely to be used to defraud private citizens out of their money or property—for example, the forgery of U.S. and foreign obligations and securities, 18 U.S.C. §§ 471, 478. Those in the second category, meanwhile—like § 505—criminalized activities likely to impugn the reputation or integrity of the federal government regardless of whether the perpetrator intended to defraud private citizens. *See, e.g.,* 18 U.S.C. § 497 (prohibiting forgery of letters patent); 18 U.S.C. § 498 (prohibiting forgery of military discharge papers); 18 U.S.C.

§ 506 (prohibiting forgery of the seal of any U.S. department or agency). In those provisions enumerating separate but related crimes and assigning different intent requirements to each, those crimes most likely to defraud private citizens were the ones containing an intent-to-defraud element. *See, e.g.,* 18 U.S.C. § 485 (requiring an "intent to defraud" to *"pass[ ], utter[ ], publish[ ], [or] sell[ ]"* counterfeit coins or bars, but not to *"falsely make[ ], forge[ ], or counterfeit[ ]"* such coins or bars (emphasis added)); 18 U.S.C. § 507 (prohibiting the forgery of ship's papers without an intent to defraud, but prohibiting the "utter[ing], publish[ing], or pass[ing]" of such papers only with "intent to defraud"). Section 505's prohibition on forging a judge's signature, which is concerned with preserving the integrity of the courts, falls logically into the category of crimes Congress intended to penalize even when the actor did not intend to deprive others of money or property. In light of this meaningful variation, we decline to read into § 505 an intent-to-defraud element Congress chose to omit.

In sum, like the Tenth Circuit, we hold that engrafting an intent-to-defraud element onto § 505 would not effectuate Congress's intent, and we find no error in the district court's jury instruction on the § 505 count omitting an intent-to-defraud requirement.

■ As an additional matter, Reich claims that there was insufficient evidence to demonstrate that he personally forged Magistrate Judge Mann's signature. Now conceding that there was evidence that the forged Order was faxed from his home,

---

**10.** Still other provisions contain other intent requirements. *See, e.g.,* 18 U.S.C. § 473 (prohibiting dealing in counterfeit obligations or securities when the actor has "the intent that the same be passed, published, or used as true and genuine"); 18 U.S.C. § 474 (prohibiting possession of plates or stones used for printing U.S. securities with "intent to use such plate, stone, or other thing … in forging or counterfeiting").

Reich argues that this could at most show that he "knowingly concur[red]" in the forgery, which, though also prohibited under § 505, is not the crime with which the government charged him. There was ample evidence presented at trial, however, that Reich himself forged the Order. For example, the government presented evidence that the author of the forged Order was intimately familiar with the Ryan Beck lawsuit and that the forged Order was faxed from Reich's residence. It is well-established that in considering a defendant's challenge to his conviction based on insufficiency of the evidence, "the evidence [must] be viewed in the light most favorable to the government and all permissible inferences drawn in its favor," and that so long as "the evidence, thus construed, suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt," the conviction must stand even if the government's case has not "exclude[d] every possible hypothesis of innocence." *United States v. Martinez,* 54 F.3d 1040, 1042–43 (2d Cir.1995) (internal citations and quotation marks omitted).

## III. Other Claims

### A. Impeachment of Character Witness

■ Reich claims that the district court erred in permitting the government to cross-examine his character witness, James Pelzer, regarding Reich's having changed the beneficiary of his law partner's life insurance policy in violation of the partnership agreement.[11] In particular, Reich cites *United States v. Monteleone,* 77 F.3d 1086, 1089–90 (8th Cir.1996), for the proposition that the life insurance incident was "private in nature and not

likely to have been known in the community at large," and thus was impermissible " 'specific act' cross-examination." We review the district court's decision to allow the question for abuse of discretion, *United States v. Damblu,* 134 F.3d 490, 494 (2d Cir.1998), bearing in mind that "[o]nce a defendant offers character testimony, the prosecution is afforded substantial latitude to rebut such evidence," *United States v. Russo,* 110 F.3d 948, 952 (2d Cir.1997).

At the outset, we note that *Monteleone,* an Eighth Circuit case, is not binding in this Circuit. Even if it were, however, we would find that it does not render the district court's decision to permit the cross-examination an abuse of discretion. First, in *Monteleone,* the conduct in question—perjury before a grand jury—was "not likely to have been known in the community at large" only because it was "protected by an obligation of secrecy," and so "the only legitimate source of any rumors pertaining to Monteleone's [conduct] would have been Monteleone himself." *Monteleone,* 77 F.3d at 1090. In contrast, Reich's conduct with respect to the life insurance policy was not legally protected as a secret and was in fact known to a number of others besides Reich himself, including his partner's family and attorneys involved in dissolving the partnership. Second, the Eighth Circuit has clarified that *Monteleone* applies to reputation witnesses but not to opinion witnesses, because "[a] specific instance of misconduct, even if not of the kind generally known in the community, would be relevant to the witness's own opinion." *United States v. Bruguier,* 161 F.3d 1145, 1150 (8th Cir.1998); *see also United States v. Birney,* 686 F.2d 102, 108 (2d Cir.1982)

---

**11.** The Federal Rules of Evidence state that "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same" is admissible, Fed.R.Evid. 404(a)(1), and may be made by "testimony as to reputation or … in the form of an opinion," Fed.R.Evid. 405(a). On cross-examination regarding reputation or opinion, "inquiry is allowable into relevant specific instances of conduct." *Id.*

(upholding trial court's admission of cross-examination question as to whether certain nondisclosures by the defendant in loan applications would affect the witness's opinion of the defendant's character). Pelzer, who testified both about his own impressions of Reich and those of the community, served as both a reputation and an opinion witness. Accordingly, because the question to which Reich objects was directed at least in part to his *opinion* testimony, it was proper regardless of whether it was generally known in the community. *See* Trial Tr. 847 ("[I]f I told you that Mr. Reich had changed the beneficiary of an insurance policy ... *would that change your opinion* or the opinion of the community ... with regard to the defendant's honesty or good character?" (emphasis added)). We also reject Reich's challenge that the cross-examination was unconstitutional because it "forced" or "compelled" him to testify. The questioning may have affected his trial strategy, but it certainly did not force him to testify.[12]

### B. False Statement Charge

■ Reich argues that the evidence adduced at trial was insufficient to prove "the precise allegation in the indictment" with respect to the false statement charge, which alleged specifically that on March 4, 2004, Reich told the FBI agents that the forged Order had not been faxed from his home. Reich contends that the agents testified at trial only that Reich had not *admitted* faxing the Order, not that he *denied* faxing it. The former is not "an express denial," he claims; rather, it is merely a "lack of forthrightness." Because the indictment charged him with an express denial, Reich argues, finding him guilty based on a lack of forthrightness

would constitute a constructive amendment of the indictment.

As the district court found, however, Reich's argument is "contrary to the facts." *Reich,* 420 F.Supp.2d at 85. One of the agents testified that when confronted with the phone records, Reich stated that he had called the Davidson fax machine by mistake when trying to reach Davidson about a deposition. Moreover, Reich himself testified that, when asked if he would admit sending the forged Order in order to avoid prosecution, he said: "No, I told them distinctly no matter what, no matter [what] the consequences ... were to me I said I would never, never say that. I didn't do it. As [I] sit here today, I will never say that I did something I didn't do." Trial Tr. 896. This testimony would have permitted a rational juror to find that Reich denied having sent the forged Order. Thus, unlike the defendant in *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), a perjury case Reich cites as analogous, Reich was not convicted based on a response that was "literally true" but "arguably misleading." *Id.* at 353, 362, 93 S.Ct. 595 (finding that the perjury statute did not criminalize the making of such statements).

### C. Special Skills Enhancement

■ Finally, Reich argues that the district court improperly applied a two-level special skills sentence enhancement, *see* U.S.S.G. § 3B1.3, to his convictions on the counts of obstruction of justice ("Count One") and making a false statement to a federal officer ("Count Three"). The special skills enhancement provides for a two-level increase in the Guidelines range whenever a defendant used a special skill "in a manner that significantly facilitated

---

**12.** On appeal, Reich did not challenge the form of the question posed to his character

witness, which took the form of a hypothetical.

**192**

the commission or concealment of the offense." *Id.; see also id.* cmt. n. 4 (naming "lawyers" as an example of individuals possessing special skills). Reich does not challenge the enhancement's application to the count of forgery ("Count Two"). He contends, however, that his special skills did not "significantly facilitate[ ]" either of the other counts.

First, Reich claims that the "sole basis" for the obstruction of justice charge was *faxing* the forged Order, and that his legal skills and training did not facilitate his use of the fax machine. The district court's "determination of whether a defendant utilized a . . . special skill in a manner that significantly facilitated the commission . . . of the offense is a question of fact reviewed for clear error." *United States v. Thorn,* 446 F.3d 378, 388 (2d Cir.2006). Count One of the indictment charged Reich broadly with "knowingly, intentionally and corruptly obstruct[ing], influenc[ing] and imped[ing] an official proceeding." This necessarily included the creation of the forged Order, without which the obstruction, influencing, or impeding of the judicial proceeding would have been impossible. Because Reich used his special skills as a lawyer to create the forged Order, it was not clear error for the district court to apply the enhancement to Count One.

Because we affirm the district court's application of the enhancement to Count One, we need not resolve Reich's challenge to the application to Count Three because the three counts of conviction were grouped pursuant to section 3D1.2(c) of the Guidelines. The offense level for the grouped counts was determined by reference to "the highest offense level of the counts in the Group," U.S.S.G. § 3D1.3(a), which was level 18 for Count One. Thus the decision to apply the enhancement to Count Three had no effect on Reich's sentencing. *See United States v. Richards,* 302 F.3d 58, 72 (2d Cir.2002) (finding "no persuasive grounds for a sentencing remand" when a defendant's challenge to one aspect of his sentence, even if successful, "would have no effect" on his term of imprisonment).

## CONCLUSION

For the foregoing reasons, we find that (1) 18 U.S.C. § 1512(c) requires a nexus between a defendant's conduct and the effect on the judicial proceeding, as described in *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), and that the trial evidence in this case was sufficient to establish such a nexus; (2) 18 U.S.C. § 505, criminalizing the forgery of a judge's signature, does not require an intent to defraud, and the evidence was sufficient to support Reich's conviction under the statute; (3) the district court did not abuse its discretion in permitting the government to cross-examine Reich's character witness regarding Reich's change to his law partner's life insurance policy because character witness was an opinion witness as well as a reputation witness; (4) the evidence was sufficient to establish that Reich personally created the forged Order; and (5) the district court's application of a special skills enhancement to Reich's conviction under 18 U.S.C. § 1512(c), after concluding that his skills as a lawyer facilitated the underlying conduct, was not clearly erroneous, and the enhancement was therefore proper. The judgment of conviction is AFFIRMED.