**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 17-4427**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

PATRICK EMANUEL SUTHERLAND,

        Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:15-cr-00225-MOC-DCK-1)

Argued:  March 20, 2019                               Decided:  April 19, 2019

Before WILKINSON, HARRIS, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Harris and Judge Quattlebaum joined.

**ARGUED:**  Barry Joel Pollack, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER, LLP, Washington, D.C., for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Dawn E. Murphy-Johnson, MILLER & CHEVALIER CHARTERED, Washington, D.C., for Appellant.  R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

WILKINSON, Circuit Judge:

Defendant Patrick Sutherland appeals from his convictions for filing three false tax returns and obstructing a grand jury proceeding. Sutherland principally contends that providing fabricated loan documents to a U.S. Attorney's office was too distant from an ongoing grand jury proceeding to meet the nexus requirement set forth in *United States v. Aguilar*, 515 U.S. 593 (1995), and *Marinello v. United States*, 138 S. Ct. 1101 (2018). The district court properly instructed the jury on the nexus requirement, however, and the jury's determinations pursuant to that instruction were based on the substantial evidence presented at trial. For the reasons that follow, we affirm.

I.

This case involves the defendant's attempts to avoid paying taxes, and his subsequent efforts to cover up those crimes. Sutherland owned or operated several insurance businesses that sold products out of the United States and Bermuda. He routed his international transactions though Stewart Technology Services (STS), a Bermuda company. Defendant claims that his sister, Beverly Stewart, owned and controlled STS, but Sutherland actually managed all its day-to-day affairs. Despite allegedly owning a multi-million-dollar business, Stewart worked at the Best Western hotel in Cody, Wyoming for less than $10 an hour. At one point, she was unable to pay a $600 fee without her hotel earnings.

Between 2007 and 2011, STS sent Sutherland, his wife, or companies that he owned more than $2.1 million in wire transfers. In each of the tax years 2008, 2009, and 2010, STS and Sutherland treated these wire transfers in inconsistent manners that

2

provided Sutherland tax advantages. See J.A. 1252-62 (Government exhibit 12A, which compiles information from 127 wire transfers). To wit, Sutherland treated the vast majority of the wire transfers from STS to his companies as bona fide loans or capital contributions, which ordinarily are not taxable income for their recipient. By contrast, STS treated nearly all of the wire transfers as expenses that had been paid to Sutherland. If the wire transfers were in fact expenses paid to Sutherland, as STS recorded them, then Sutherland and his companies should have reported the wire transfers as taxable income. Far from reporting them as income, however, Sutherland either treated the transfers from STS to him and his wife as bona fide loans or failed to account for them in his general ledger altogether. In the end, Sutherland did not report the $2.1 million as income on his tax returns.

Sutherland's treatment of the STS transfers mirrored his treatment of other income. Indeed, the defendant seemed to think that marking income as a capital contribution or loan was a foolproof scheme. For example, three Sutherland companies—Insigne Consulting, Insigne, Inc., and XYZ Entertainment—sent almost $42,000 to Kryotech Holdings, another Sutherland company, between 2007 and 2009. The paying companies recorded each transfer as a non-taxable marketing expense, while Kryotech treated the payments as non-taxable capital contributions. The net result: none of Sutherland's companies would pay taxes on those funds. Similarly, Insigne, Inc., received more than $125,000 in taxable fees from another firm, Global Financial Synergies, between 2006 and 2010—yet Sutherland described the majority of them as nontaxable capital contributions. Come tax day, despite the millions of dollars flowing through his

3

accounts, Sutherland reported just $88,979 of income in 2008; $16,669 in 2009; and $72,415 in 2010.

But the scheme was short lived. In April 2012, Sutherland was served with grand jury subpoenas seeking financial records from his companies, including Insigne Consulting, Insigne Financial Services, Insigne, Inc., Kryotech Holdings, and XYZ Entertainment. Just three months later, Sutherland's attorney sent to the U.S. Attorney's office a letter that purported to explain away a large number of transactions relating to the subpoenaed materials. With respect to the wire transfers from STS to Sutherland's companies, the letter said that each transfer was a loan that was "contemporaneously documented by written and fully-executed loan agreements," J.A. 1309. Those agreements were attached to the letter.

In 2015, a federal grand jury indicted Sutherland for filing false returns in the tax years 2008, 2009, and 2010, in violation of 26 U.S.C. § 7206(1), and for obstructing, influencing, or impeding the 2012 grand jury investigation, or attempting to do so, in violation of 18 U.S.C. § 1512(c)(2). See also *id.* § 2 (aiding and abetting).

The evidence at trial not only outlined the financial misdeeds described above, but also demonstrated that the loan documents Sutherland sent to the U.S. Attorney's office in July 2012 had been fabricated. Read together, the documents implausibly pledged that Sutherland would give STS 120% of the proceeds of any sale of his businesses. While the documents had purportedly been signed by Sutherland's sister, evidence revealed that Sutherland commonly signed documents for her. The loan documents from Sutherland, moreover, conflicted with internal accounting documents from STS (the purported

4

lender). Finally, the government introduced documents in which Sutherland claimed to have made loan payments by transferring interests in his other businesses to STS. But these related documents were bogus and backdated. A document supposedly signed in 2011, for example, described how Sutherland's businesses had "received loans from [STS] in 2011, 2012, and 2013." J.A. 1333. Legitimate documents do not reference potential future transactions in the past tense, just as bona fide loans do not require fake payment trails.

The jury had little trouble seeing through Sutherland's manipulations of his accounting records and attempts to fabricate loan documents to cover his tracks. It found Sutherland guilty on all charges. And the district court ultimately sentenced Sutherland to a term of thirty-three months in prison. Defendant now appeals.

## II.

Sutherland's primary challenge is to his conviction on the grand jury obstruction count under 18 U.S.C. § 1512(c)(2).[*] Section 1512(c)(2) provides: "Whoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." The statute includes three core elements. The government must show that the defendant (1)

---

[*] Sutherland also challenges the sufficiency of the evidence for his false tax return convictions, and, in a footnote, the district court's loss calculations at sentencing. We have reviewed the record and concluded that the false tax return verdicts were supported by substantial evidence, and that the district court's factual determinations at sentencing were not clearly erroneous. See *United States v. Shephard*, 892 F.3d 666, 670 (4th Cir. 2018) (describing clearly erroneous standard for factual determinations at sentencing).

"corruptly" (2) "obstruct[ed], influence[d], or impede[d]" (3) an "official proceeding," or attempted to do so. See *United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019). The government must also demonstrate a "nexus" between the obstructive act and the official proceeding, as explained in *Aguilar*, 515 U.S. 593, and *Marinello*, 138 S. Ct. 1101.

A.

Sutherland contends that the government failed to prove a nexus between his conduct and an official proceeding. He was, he says, only "attempting to influence the U.S. Attorney's Office," not the grand jury. Supp. Br. for Appellant, at 6. He correctly notes—and the government does not contest—that the U.S. Attorney's investigation is not by itself an official proceeding. The term "official proceeding" is defined by 18 U.S.C. § 1515(a)(1) to include, *inter alia*, "a Federal grand jury" or "a proceeding before a Federal Government agency which is authorized by law." FBI investigations, for example, are not official proceedings because the statutory language including "a proceeding before a Federal Government agency which is authorized by law," § 1515(a)(1)(C), "implies 'some formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any member of the agency.'" *Young*, 916 F.3d at 384 (quoting *United States v. Ermoian*, 752 F.3d 1165, 1171 (9th Cir. 2013) (FBI investigation)); see also *United States v. Ramos*, 537 F.3d 439, 460-64 (5th Cir. 2008) (Border Patrol investigation). The same logic equally applies to the investigation by the U.S. Attorney's office in this case, meaning that its investigation was not an official proceeding.

The term "official proceeding" thus implies something more formal than a mere investigation. That limiting term prevents a statutory sprawl in which the countless communications of citizens with one agency or another of the federal government lay the groundwork for a potential obstruction prosecution. See *Marinello*, 138 S. Ct. at 1109-10 (reading tax obstruction statute not to extend to "routine, day-to-day work carried out in the ordinary course by the IRS," *id.* at 1110). This back and forth between citizens and government works as a general matter to the benefit of both. Much of this activity is a wholly legitimate effort to "influence" the government. See 18 U.S.C. § 1512(c)(2). And indeed it is not far-fetched to think that an obstruction statute encroaching too aggressively on innocent citizen/agency interactions would infringe the basic right to petition guaranteed by the First Amendment of our Constitution. See U.S. Const. amend. I ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."). Then, too, a statute that chills or burdens excessively the right of persons to protest or prove their innocence in the face of a government investigation would run counter to the operation of criminal justice as we have known it.

There are thus important safeguards to prevent the abuse of § 1512(c)(2). As the Court held in *Aguilar*, "it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." 515 U.S. at 599. Providing materially false documents with an intent only to influence the U.S. Attorney's investigation, therefore, would not amount to a violation of § 1512(c)(2). See *Young*, 916 F.3d at 387 ("[T]he Government has similarly failed to provide evidence

7

demonstrating that Young . . . designed his conduct to thwart [the grand jury] investigation, rather than designing his conduct to obstruct an FBI inquiry . . . ."). To be clear, knowingly giving false documents to a prosecutor without the intent to obstruct a grand jury may violate other federal statutes. *E.g.*, 18 U.S.C. §§ 1001(a), 1519. Just not § 1512(c)(2).

Section 1512(c)(2) also requires proof that a particular grand jury proceeding was "reasonably foreseeable" to a defendant who has been charged with obstructing that proceeding. *Young*, 916 F.3d at 386 (citing *Arthur Anderson LLP v. United States*, 544 U.S. 696, 707-08 (2005)). While the grand jury does not yet have to be convened, it is not enough for the government to argue that a defendant could have speculated that some official proceeding lies somewhere in the offing. The *Young* case illustrates the point. In that case, the defendant had intentionally misled FBI agents. But this court vacated defendant's conviction because "the only way the jury could have concluded he foresaw a particular grand jury investigation would be through speculation." *Young*, 916 F.3d at 387.

As so often in law, there is a balance to be struck. Though obstruction statutes are susceptible to abuse, they also exist for good reason. Official proceedings are crucial to the conduct of government. They are entitled to go forward free of corrupting influences that not only delay them but increase the chances of false and unjust outcomes. The federal grand jury investigation in this case is but one example of such an "official proceeding." See J.A. 1066 (jury instruction that the grand jury was an "official proceeding"). The government has every right to prosecute those who would corrupt it.

8

Compromised proceedings in turn diminish public confidence in the workings of government and lead to the sort of creeping cynicism toward it that affects so many nations. Section 1512(c)(2) and other like statutes help to protect against that eventuality here.

B.

Sutherland insists there was an insufficient nexus between his conduct and the grand jury. The nexus requirement that the government had to prove under § 1512(c)(2) comes from *Aguilar* and *Marinello*. *Aguilar* dealt with a conviction under 18 U.S.C. § 1503, another obstruction statute, for "corruptly endeavoring to influence, obstruct, and impede the grand jury investigation." 515 U.S. at 598 (internal quotation marks and alterations omitted). The Supreme Court held that there must be a "nexus" between a defendant's conduct and the proceeding he obstructed. This meant that his actions needed to have a "relationship in time, causation, or logic" to the obstructed proceeding. *Id.* at 599. In other words, obstruction must have been "the natural and probable effect" of the defendant's actions. *Id.* (internal quotation marks omitted). This nexus requirement demonstrated "restraint in assessing the reach of a federal criminal statute" in order to reinforce the principles of deference to Congress and fair notice to the accused. *Id.* at 600.

The *Aguilar* nexus requirement has flown as the crow flies straight to *Marinello*. In that case, the Court interpreted the reach of 18 U.S.C. § 7212(a), which prohibits obstruction of "the due administration of [the Internal Revenue Code]." *Marinello*, 138 S. Ct. at 1105 (emphasis omitted) (quoting § 7212(a)). A jury found that Marinello had obfuscated his tax records with the intent to gain a personal advantage, but not that he

9

knew of an ongoing proceeding related to his tax records or intended to interfere with it. The Court held that the government had not proven enough to sustain an obstruction charge. It noted that the principles outlined in *Aguilar* "apply . . . with similar strength" to the Internal Revenue Code obstruction statute. *Id.* at 1106. Without a nexus requirement, any interactions with the IRS could have been subject to § 7212(a), including "day-to-day work carried out in the ordinary course by the IRS, such as the review of tax returns." *Id.* at 1110. The Court refused to "transform every violation of the Tax Code into an obstruction charge," *id.*, and thus required a "relationship in time, causation or logic" between a defendant's actions and a "particular administrative proceeding." *Marinello*, 138 S. Ct. at 1109 (quoting *Aguilar*, 515 U.S. at 599).

The jury instructions in this case drew directly from the principles in *Aguilar* and *Marinello*. The district court first instructed the jury that it must decide whether Sutherland "knew that" the grand jury proceeding "was pending" when he distributed the false loan documents. J.A. 1066. It instructed the jury that the defendant must have acted "corruptly with the intent to obstruct, influence or impede the official proceeding." *Id.* And, finally, the district court crafted an instruction on the nexus requirement straight from *Aguilar*: "The government must prove that the defendant . . . intended or knew his actions would have the natural and probable effect of interfering with the grand jury." *Id.*; *Aguilar*, 515 U.S. at 599 ("[I]f the defendant lacks knowledge that his actions are likely to affect the [official] proceeding, he lacks the requisite intent to obstruct."). The jury instructions, in other words, properly stated the nexus requirement that the jury had to apply to Sutherland's case.

10

C.

The facts of Sutherland's case fit comfortably within the above *Aguilar/Marinello* criteria, especially when viewing, as we must, the trial evidence in the light most favorable to the government as the prevailing party. *United States v. White*, 810 F.3d 212, 228 (4th Cir. 2016). The official proceeding Sutherland attempted to influence was not some far-off possibility. The grand jury had in fact convened. Sutherland's actions, moreover, show a clear "relationship in time, causation or logic with the" grand jury proceedings. *Marinello*, 138 S. Ct. at 1109 (quoting *Aguilar*, 515 U.S. at 599). Indeed, Sutherland's actions are related to the grand jury in time, causation, *and* logic. The temporal and logical relationships are clear: Sutherland distributed the false loan documents just months after the grand jury subpoena was served upon him, and those documents attempted to explain away transactions reflected in the subpoenaed documents.

The causal relationship between Sutherland and the grand jury rests in part on the meaningful differences between the prosecutor in his case and the FBI agent in *Aguilar*. In A*guilar*, the government had proven that the defendant had lied to an FBI agent who had "not been subpoenaed or otherwise directed to appear before the grand jury." 515 U.S. at 601. The Court held that no rational jury could find a nexus between the defendant's false statements and the pending grand jury proceeding. 515 U.S. at 600-02. At the same time, the Court acknowledged that "a jury could find [a] defendant guilty" if he lied to an individual who had already been subpoenaed to testify before the grand jury. *Id.* at 602.

In the instant case, Sutherland gave false documents to the U.S. Attorney's office. A prosecutor tasked with presenting to the grand jury is more akin to a witness who has been subpoenaed than one who has not. As with a subpoenaed witness, there is a strong likelihood that the U.S. Attorney's office would serve as a channel or conduit to the grand jury for the false evidence or testimony presented to it. "[A]ttorneys for the government," after all, may be present while the grand jury is in session. Fed. R. Crim. P. 6(d)(1). The causal relationship between the U.S. Attorney's office and the grand jury is that envisioned by the *Aguilar* decision.

We thus join the Second Circuit in recognizing that the "discretionary actions of a third person," as here, can form part of the nexus to an official proceeding. *United States v. Reich*, 479 F.3d 179, 185 (2d Cir. 2007) (Sotomayor, J.). In *Reich*, for example, the criminal defendant had sent an opposing party in an earlier civil proceeding a forged court order that would have mooted that party's outstanding mandamus petition. The opposing party then withdrew the petition. Because it was "foreseeable" that forging a court order would cause the opposing party to withdraw its petition, the "evidence [was] clearly sufficient to establish a relationship in time, causation, or logic between Reich's transmission of the forged order and effects on the [official] proceeding." *Id.* at 186 (internal quotation marks omitted). As in *Reich*, where forwarding the fake or forged document had the foreseeable consequence of reaching and influencing an ongoing court proceeding, a rational jury could find that Sutherland's giving false evidence to the U.S. Attorney's office in charge of presenting evidence to the grand jury in fact had one

12

intended and foreseeable consequence: transmission of those documents to the grand jury.

At the end of the day, Sutherland's efforts to corrupt the grand jury in this case lie at the heart of the conduct prohibited by § 1512(c)(2). He had already violated the federal income tax laws multiple times, and, in an effort to cover up his crimes, he distributed phony loan documents to prosecutors with the intent to influence an ongoing federal grand jury proceeding that was closing in on him. Because the jury was properly instructed and found Sutherland guilty based on ample and substantial evidence, we affirm Sutherland's § 1512(c)(2) conviction.

## III.

Sutherland also raises several issues related to the course of his trial. First, he argues that the government's closing argument was so disconnected from the evidence that he was denied a fair trial. Second, he argues that the district court improperly admitted several pieces of evidence that should have been excluded as improper character evidence under Rule 404(b). We address each contention in turn.

## A.

The defendant contends that the prosecution improperly suggested that all $2.1 million in wire transfers from STS to Sutherland or his domestic entities should have been treated as income. Because he failed to object at the time, the matter is before us on plain error review. See *United States v. Olano*, 507 U.S. 725 (1993). Sutherland has failed to identify any error, much less a plain one. The evidence supported the government's closing argument that Sutherland should have reported the STS wire

13

transfers as income. The government proved that the wires had been sent and plainly discredited the fabricated loan documents during trial.

Even if the closing argument had somehow been improper, however, it did not affect Sutherland's "substantial rights." *Olano*, 507 U.S. at 736. Closing arguments are just that—arguments. They are prone to exaggeration; we rely on juries and the adversarial process to place them in perspective. The district court instructed the jury to trust its own recollections of the evidence, and that closing arguments were not evidence themselves. J.A. 980-81. And Sutherland had the opportunity to respond to arguments he felt were unsupported by the evidence with objections or better arguments of his own. He did neither.

B.

Sutherland also argues that the district court wrongly admitted character evidence over his objections. Sutherland targets three pieces of evidence: Sutherland's 2007 tax return; Sutherland's statement to Michael Jones, his business partner until 2008, that his financial transactions were difficult to trace; and testimony about Jones's past lawsuit against Sutherland. We review the district court's evidentiary rulings for an abuse of discretion, and we will not vacate a conviction if an error was harmless. *United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018).

Federal Rule of Evidence 404(b)(1) prohibits evidence of a "crime, wrong, or other act" from being used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But the rule does not prohibit such evidence from being used for another purpose, such as, for example,

14

proving motive, opportunity, or intent. Fed. R. Evid. 404(b)(2). The rule also does not affect the admission of evidence that is "intrinsic to the alleged crime." *United States v. Otuya*, 720 F.3d 183, 188 (4th Cir. 2013) (internal quotation marks omitted). "[E]vidence of other bad acts is intrinsic if, among other things, it involves the same series of transactions as the charged offense," *id.* (internal quotation marks omitted), or if it is "necessary to complete the story of the crime on trial," *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (internal quotation marks omitted).

The contested pieces of evidence were properly admitted as intrinsic evidence. Sutherland's 2007 tax return, for example, involved the "same series of transactions," *Otuya*, 720 F.3d at 188, that were at issue in tax years 2008-10. After all, STS had already begun transferring money to Sutherland in 2007, and several of the fabricated loan documents described transactions from 2007. The same is true of Jones's testimony that, during litigation between them, Sutherland said that his "accounting was very complicated" and that "funds had moved around amongst various accounts so that it would have taken [an] expert a very long time to figure out." J.A. 456. Once again, in describing his books and funding maneuvers, Sutherland was amplifying the very trial narrative before the jury.

Sutherland also argues that Jones was improperly allowed to testify about a civil lawsuit he had filed against Sutherland. But Sutherland predominately cites to salacious details of the lawsuit that were elicited during *cross examination*. See J.A. 467, 498-99. Sutherland made a strategic choice at trial to delve into the details of Jones's lawsuit against him, which demonstrated Jones's potential bias. But Sutherland cannot now

15

lament the admission of that which he ushered into evidence. Indeed, Sutherland did not object to Jones's brief mention that he was "in litigation" with Sutherland during direct examination. J.A. 454. That limited testimony provided context for Sutherland's statement that his accounting was complex, and it was "necessary to complete the story of the crime on trial." *Basham*, 561 F.3d at 326 (internal quotation marks omitted). The district court thus did not abuse its discretion in admitting these pieces of evidence against Sutherland.

## IV.

For the foregoing reasons, the judgment is in all respects

*AFFIRMED*.